Filed 1/12/16  P. v. Wilson CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEANDIE L. WILSON et al,<br><br>    Defendants and Appellants. | B260990<br><br>(Los Angeles County<br>Super. Ct. No. TA133344) |

APPEAL from judgments of the Superior Court of Los Angeles County, Allen Joseph Webster, Jr., Judge.  Affirmed in part, reversed in part, and remanded.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Deandie L. Wilson.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant Burlena King.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendants and appellants Deandie Wilson and Burlena King of first degree residential robbery (Pen. Code, § 211[1]) and conspiracy to commit a crime (§ 182, subd. (a)). The jury also convicted Wilson of assault with a firearm. (§ 245, subd. (a)(2).) As to Wilson, the jury found true the allegations that he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a), and personally used a firearm within the meaning of section 12022.5 in the commission of each of the offenses.[2] With respect to King, the jury found that a principal was armed with a firearm within the meaning of section 12022, subdivision (a) in the commission of the residential burglary. In a bifurcated proceeding, Wilson waived his right to a jury trial on prior conviction allegations. As to each of the counts, the trial court found true the allegations that Wilson suffered a prior conviction within the meaning of sections 667, subdivision (d) and 1170.12, subdivision (b); 667, subdivision (a)(1); and 667.5 subdivision (b). The trial court sentenced Wilson to state prison for 30 years, and King to state prison for five years.

On appeal, Wilson argues that the trial court infringed on his right to present a defense when it denied him the opportunity to cross-examine the victim on his immigration status; abused its discretion when it denied his new trial motion; and imposed an unauthorized sentence when it stayed imposition of a one-year section 667.5, subdivision (b) sentence enhancement rather than striking that term.[3] King argues that the prosecutor committed misconduct by shifting the burden of proof through questions that implied that King had to produce expert testimony to corroborate her claim about certain evidence; the trial court abused its discretion and violated her due process rights

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

[2] With respect to the burglary offense, the jury also found true the allegation that Wilson personally used a firearm within the meaning of section 12022.53, subdivision (b).

[3] King joins Wilson's new trial argument.

2

to confront the witnesses against her and to present a defense when it prohibited King from presenting evidence about the victim's immigration status; defense counsel provided ineffective assistance of counsel in failing to request an instruction on third-party culpability; and the prosecutor committed misconduct in rebuttal closing argument when she compared the jury's task with "putting together a puzzle."[4]  We reverse the trial court's order staying imposition of Wilson section 667.5, subdivision (b) sentence enhancement and remand the matter to the trial court to exercise its discretion to impose or strike the enhancement.  We otherwise affirm the judgments.

## BACKGROUND

In 2005, Francisco Rodriguez drove under the influence of alcohol and possessed a fake driver's license or identification card.  In 2007, he was convicted of a felony— taking another person's car without permission.

On the night of March 25, 2014, Francisco Rodriguez attended a party that continued into March 26, 2014.  At the party, Rodriguez consumed beer and cocaine.  He left the party about 2:30 a.m. and went home.

Rodriguez remained home until 4:00 or 5:00 a.m.  He then got into a taxi intending to go to his friend's auto body shop where he would help his friend work on cars.  On the way to the auto body shop, the taxi stopped at a corner, and the taxi driver "had [Rodriguez] meet" King.  King invited Rodriguez to the motel at which she lived.  Rodriguez, who was not "fully with it" due the alcohol he consumed at the party, got out of the taxi and accompanied King to the High Rise motel.

Rodriguez and King went to a motel room that King had rented earlier that day.  Rodriguez entered the room, sat on the bed, and, at King's direction, took off his shirt.  King started texting on her phone.  King went into the bathroom.  When she came out, she was speaking on the phone.  She went to the window and looked outside.  Rodriguez

---

**4**    Wilson joins King's argument that the prosecutor committed misconduct by her puzzle analogy in rebuttal closing argument.

3

did not know what King "may have been expecting." King then went to the door and opened and closed it.

Rodriguez remained in the room with King for about an hour. Rodriquez watched T.V. and King was "on the phone entertaining herself." Rodriguez told King that he liked her, apparently to gauge her interest in having sex with him. King took off her pants, but they did not have sex. Rodriguez denied that he paid King money to perform oral sex on him. While in King's room, Rodriguez consumed cocaine.

At some point, Wilson entered King's room. He fired about three gunshots at Rodriguez. Rodriguez sustained a gunshot to his right arm. Rodriguez got up and attempted to move, but defendants grabbed him and he was knocked to the floor. Wilson struck Rodriguez on the face with a gun. Wilson and King put their hands in Rodriguez's pockets and Wilson removed Rodriguez's wallet, which contained about $20 or $30. After they took Rodriguez's wallet, defendants left the motel room. Defendants drove away in a white car.[5] Rodriguez was bleeding from his jaw. He poured beer on his injury and consumed cocaine to calm down.

Rodriguez went downstairs and, at 6:42 a.m., approached a woman and asked for help. The woman motioned for him to leave, and he complied. Between 6:30 and 7:00 a.m., motel employee Sumitra Keaval saw a man in the parking lot whose cheek was bleeding. Keaval asked the man if he needed help. He said, "No." Keaval "asked about the police." The man said, "No."

Rodriguez asked a woman who was washing her car if she would take him to the hospital. The woman said she would and drove him to Community Hospital in Huntington Park. Rodriguez spoke with Los Angeles County Sheriff's Department deputies at the hospital. He told the deputies that he had been shot at the motel.

The hospital's nursing notes stated the Rodriguez claimed that two "Black guys" robbed him of his wallet on Long Beach Boulevard in Compton. Rodriguez initially testified that he did not remember telling a nurse what had happened to him. Later he

---

**5** On cross-examination, Rodriguez testified that he did not see King get into the car.

4

testified that he told "medical personnel" that he was robbed by two persons. Rodriguez told a nurse that a friend brought him to the hospital. Rodriguez appeared to have two gunshot wounds to his right arm and a laceration on his lip. He said he was hit in the face with a gun. Rodriguez's jaw was broken.

Also on March 26, 2014, Los Angeles County Sheriff's Department Deputy Manuel Solis spoke with Rodriguez at the hospital. At the time, Rodriguez was medically sedated. Deputy Solis had trouble communicating with Rodriguez. Rodriguez said that he was walking on Long Beach Boulevard when he saw an African-American woman standing near a motel. The woman beckoned him over. Rodriguez said he walked over to the motel and entered a room. Upon entering the room, he was attacked from behind and shot. He said he heard two loud gunshots. He described the suspects as a six-foot, two inch, 240-pound African-American man and an African American woman who was wearing a pink top and white shorts.

Deputy Solis went to the High Rise motel and spoke with Keaval. He examined the room where the alleged incident occurred. Although the room—room 14—appeared to have been cleaned, there was blood splattered on the counter, a dresser, and a wall. There was a hole that appeared to have been plastered over.

Deputy Solis watched a surveillance video from the motel. The video showed Rodriguez and King enter room 14 together between 5:00 and 6:00. It did not show "any type of commotion" when Rodriguez entered the room. About four minutes later, a white sedan arrived at the motel. The video did not show room 14's door open or anyone looking out the window. Rodriguez and King remained in the room for about 40 minutes when a person got out of the white sedan and entered room 14. King then ran out of the room and toward Long Beach Boulevard. She was naked from the waist down.

Pursuant to a search warrant, Los Angeles County Sheriff's Department Detective Dennis Parker searched Wilson's and King's cell phones. Data from the cell phones showed that Wilson and King were communicating together by text at the time of the incident. The texts included the following:

5

At 6:22:04, King texted Wilson, "Come run n the room. He got a lot over money 14."

At 6:22:14, King texted Wilson, "Come now."

At 6:26:14, King texted Wilson, "The door is open."

At 6:27:13, Wilson texted King, "I'm here. Someone is outside."

At 6:27:18, King texted Wilson, "Come now."

At 6:27:48, King texted Wilson, "You too drunk."

At 6:28:50, Wilson texted King, "Warming. There truck and taxi."

At 6:28:40, Wilson texted King, "Around the corner, on Carlin."

At 6:20:59[6], King texted Wilson, "You too drunk, baby."

At 6:29:23, King texted, "H-kill," which means, "You okay?"

Data from Wilson's cell phone showed texts between Wilson and "Profit." The texts showed that during the evening of March 26, 2014, Wilson discussed with Profit purchasing or trading a gun.

Testifying in her own behalf, King admitted that she worked as a prostitute. On March 26, 2014, between 5:00 and 6:00 a.m., she was standing at the corner of Euclid and Long Beach Boulevard when Rodriguez arrived in a taxi. He called her over, and she asked, "What do you want to do?" Rodriguez responded, "A blow job." King agreed to perform that act and they agreed on a price. King and Rodriguez took the taxi to a motel where Rodriguez paid for a room.

King and Rodriguez went to room 14. Rodriguez paid King $60. King performed oral sex on Rodriguez for 15 minutes, but he could not attain an erection. King told him that "it was a waste of time." Rodriguez responded, "No. I want everything." King believed that Rodriguez wanted "to have sex." She told him that he would have to pay an additional $100, which sum he paid. King removed her pants and got on top of Rodriguez for about 35 minutes. King testified that although Rodriguez could not attain an erection, they had intercourse. King told Rodriguez that his time was up.

---

**6** The texts otherwise were presented in chronological order. Thus, it may be that the prosecutor misspoke when she asked about the "6:20:59" text.

6

King got up and began to put on her clothes.  Rodriguez grabbed her and threw her on the bed.  Rodriguez said that he hated to see his money go to waste.  King felt her life was in danger, so she grabbed her cell phone and sent a voice text to Wilson, her boyfriend.  King said into the phone, "Come run into room now.  He's trying to take advantage over me."  Her phone translated those words into the text, "Come run n the room.  He got a lot over money 14."  She did not check the text before she sent it.

King explained that her "you too drunk" texts to Wilson were sent accidently.  She had not turned off the voice text feature on her cell phone which picked up her statement to Rodriguez that he was "too drunk."  She acknowledged, however, that even when her phone was in the voice text setting, she had to press "send," to send a voice text.

When Wilson entered the room, Rodriguez jumped up and tried to remove something from his pants.  King testified that Rodriguez had a little pocket knife.  Wilson struck Rodriguez on the chin.  King ran from the room.  She was afraid and naked from the waist down.

## DISCUSSION

### I.    Rodriguez's Immigration Status

King contends that the trial court violated her right to confront and cross-examine witnesses, to due process, and to present a defense when it granted the prosecution's motion to exclude evidence of Rodriguez's immigration status—i.e., that he had asked the prosecutor about acquiring a "U-Visa" and thus had an incentive to testify in a manner that would make himself eligible for a U-Visa.[7]  Wilson asserts a violation of his

---

[7]    Under Federal immigration regulations (8 C.F.R. § 214.14), a U-Visa permits an "undocumented immigrant" (see *In re Garcia* (2014) 58 Cal.4th 440, 446, fn. 1, adopting the term "'undocumented immigrant' to refer to refer to a non-United States citizen who is in the United States but who lacks the immigration status required by federal law to be lawfully present in this country and who has not been admitted on a temporary basis as a nonimmigrant") who is a victim of certain crimes and who assists law enforcement in the investigation or prosecution of the crime to remain temporarily in the United States.

due process right to present a defense based on the trial court's exclusion of the U-Visa evidence. The trial court did not err.

A.     *Background*

Prior to trial, the prosecutor moved to exclude evidence of Rodriguez's immigration status. She explained that, at a pre-trial hearing, Rodriguez "mentioned to [her] something about wanting a U-Visa." The prosecutor stated that she had not brought up the issue of a U-Visa with Rodriguez or told him that her office could help him attain such a visa. She told Rodriguez that he would have to obtain a U-Visa on his own "at the conclusion." Because Rodriguez had not applied for or been promised a U-Visa, the prosecutor argued, it would be premature to allow defense counsel to inquire about Rodriguez's immigration status.

King's defense counsel argued that evidence that Rodriguez approached the prosecutor about a U-Visa and was told he had to "wait until the conclusion" of the case and that "what happens in this case will affect him getting the U-visa" was directly relevant to Rodriguez's credibility and demonstrated a reason to fabricate or exaggerate the incident to support his U-Visa application. The prosecutor denied that Rodriguez was told that "what would happen in this case was going to affect the U-visa." Wilson's defense counsel "submitted."

The trial court excluded the evidence, finding that Rodriguez's immigration status was not relevant to whether defendants committed the charged crimes. The trial court also found the evidence would be inflammatory and highly prejudicial. The trial court's concern was that a juror might have the view that "I don't like anybody who is here from another country so I won't believe nothing that they say."

B.     *Application of Relevant Principles*

As set forth above, an undocumented immigrant victim of certain crimes may be permitted to remain in the United States temporarily if he assists law enforcement in the investigation or prosecution of the crime. (8 C.F.R. § 214.14.) Relying on Evidence

8

Code section 780, subdivision (f), defendants contend that evidence about Rodriguez's U-Visa inquiry was relevant to Rodriguez's credibility because it showed he had a motive and bias to conform his testimony to best ensure that he would qualify for a U-Visa and that the prosecution would assist him in obtaining a U-Visa.

A party may cross-examine a witness about the witness's motive and bias. (Evid. Code, § 780, subd. (f).) Moreover, "[a]s a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias. [Citations.]" (*People v. Brown* (2003) 31 Cal.4th 518, 544.) Although "'[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*Id.* at p. 545.)

Evidence Code section 210 provides, "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." "The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.]" (*People v. Scheid* (1997) 16 Cal.4th 1, 13-14.)

Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "Evidence is substantially more prejudicial than probative . . . if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

We review for abuse of discretion a trial court's relevance determination and its decision to admit or exclude evidence under Evidence Code section 352. (*People v.*

*Jablonski* (2006) 37 Cal.4th 774, 821, 824.) "[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) "When the reviewing court applying state law finds an erroneous exclusion of defense evidence, the usual standard of review for state law error applies: the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.)

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" (U.S. Const., 6th Amend.; *Pointer v. Texas* (1965) 380 U.S. 400 [extending Sixth Amendment to state proceedings through Fourteenth Amendment].) To effectuate this guarantee, the trial court must afford a criminal defendant the opportunity for effective cross-examination of adverse witnesses. (*Delaware v. Fensterer* (1985) 474 U.S. 15, 19-20; *People v. Carter* (2005) 36 Cal.4th 1114, 1172.) "[T]he cross-examiner is not only permitted to . . . test the witness'[s] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) Accordingly, "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) A trial court's reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value does not violate a defendant's right to confront and cross-examine witnesses. (*People v Brown, supra,* 31 Cal.4th at p. 545.) "'"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." [Citation.] We ask whether it is

10

clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159.)

"'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'" (*People v. Blacksher* (2011) 52 Cal.4th 769, 821.) Thus, "[a]lthough the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.)

Here, the trial court acted within its discretion in excluding evidence concerning Rodriguez's U-Visa inquiry because that evidence was only marginally relevant to Rodriguez's credibility, while its admission would necessitate an undue consumption of time and there was a substantial danger of undue prejudice. According to the prosecutor, Rodriguez "mentioned to [her] about wanting a U-Visa." She did not tell Rodriguez that her office could help him obtain a U-Visa and told him that he would have to obtain a U-Visa on his own. There was no evidence that Rodriguez had applied for a U-Visa. Thus, there was no basis for concluding that Rodriguez would alter his testimony in hopes of obtaining a U-Visa and any probative value the evidence had on Rodriguez's credibility was marginal. In addition, this is not a case in which the alleged victim just showed up and reported he was a victim of a crime. In such a situation, the U-Visa might be relevant in showing motive. Here, Rodriguez was in the hospital as a result of being assaulted and was first approached by law enforcement. Moreover, apart from the marginal impeachment value of the U-Visa evidence, the inconsistencies in Rodriguez's accounts of the incident provided defense counsel with other evidence with which to attempt to impeach Rodriguez's credibility.

If, however, the trial court had permitted defense counsel to examine Rodriguez about his U-Visa inquiry, one of the parties would have had to call an expert in immigration law to explain the qualifications and procedures for obtaining a U-Visa. Given the "arcane" nature of immigration law (see *Ardestani v. I.N.S.* (1991) 502 U.S. 129, 146) such testimony had the potential for consuming considerable time. Given

11

Rodriguez's status as an undocumented immigrant, there also was a substantial danger that a juror might reject his testimony based on his unlawful status in the United States. Indeed, on appeal, Wilson argues that the evidence concerning Rodriguez's U-Visa inquiry was "relevant to establish that Rodriguez was unlawfully in the country and seeking assistance from the prosecutor in obtaining lawful status." Accordingly, the trial court acted within its discretion under Evidence Code section 352 in excluding evidence of Rodriguez's U-Visa inquiry.

Finally, in light of the strong evidence of defendants' guilt, it is not reasonably likely that defendants would have received a more favorable outcome if the trial court had permitted them to introduce the U-Visa evidence. (*People v. Humphrey, supra,* 13 Cal.4th at p. 1089.)

## II.     Defendants' New Trial Motion

Wilson contends that the trial court applied the wrong legal standard in ruling on his new trial motion and thus abused its discretion in denying the motion. As noted above, King joins Wilson's new trial argument. The trial court did not err.

### A.     *Background*

Wilson filed a new trial motion arguing that the jury's guilty verdicts and firearm use and infliction of great bodily injury findings were contrary to the evidence. Wilson argued that the trial court should reject the jury's verdicts and findings based on Rodriguez's asserted lack of credibility and perjury. King joined the motion.

At argument on Wilson's motion, defense counsel said to the trial court, "I am throwing the ball basically in your court. [¶] I have not in my 30 years seen a more pronounced perjurer than that witness in this particular case. I mean, his assertion that he was unconscious at the preliminary hearing, that he was like a baby, is just a bunch of baloney. And I don't think, based on his testimony, the State of California should be putting Mr. Wilson in prison. [¶] And, again, as the 13th juror, you have the power to overturn the verdict based on your perception of the witness. I'm sure you recall him, as

12

you always do.  [¶]  So, again, I'd just ask the court to grant us a new trial based on that witness's incredible performance."

The prosecutor responded that Rodriguez noticeably had significant difficulty communicating with the attorneys and interpreter at trial, but that he was not a perjurer. She attributed Rodriguez's communication difficulties to his injured jaw.  She stated that Rodriguez testified at the preliminary hearing that he was still on medication and dealing with the pain of his injuries, including his jaw injury.  Any minor inconsistencies or mistakes Rodriguez may have made, she argued, were attributable to the "shock of the situation" and his injuries.  Moreover, the prosecutor argued, all of Rodriguez's testimony was corroborated by other evidence.

Wilson's defense counsel stated that Rodriguez's medical records indicated that he was alert and oriented and that a deputy testified that Rodriguez was not under stress. King's defense counsel added that the preliminary hearing transcript showed that Rodriguez was able to answer the questions posed to him, demonstrating that he understood the questions but answered them untruthfully.

The trial court denied the new trial motion, stating, "Well, the court did hear the evidence.  Basically, I obviously presided over the trial.  And there is a jury instruction that says that two people can witness the same event and just see or hear it differently. And there were certainly a number of inconsistencies on the part of the victim, but there also were other inconsistencies on the part of other witnesses as well.  But it seems to the court on balance, when you take into consideration the 9-1-1 calls and the video and cell phones and the medical records and the civilian as well as law enforcement witnesses, they tended to corroborate his testimony.

"So it appears to the court that he might have been inconsistent, there may have been a number of inconsistencies or conflicts, and maybe he might not have been the most credible witness that we've seen testifying, but the jury felt that basically the evidence was sufficient enough beyond a reasonable doubt to find him guilty of these charges."

13

## B. Application of Relevant Principles

In ruling on a new trial motion under section 1181, subdivision (6), a trial court sits, in effect, as a "13th juror" and independently examines the evidence to determine if the evidence is sufficient to prove the required elements beyond a reasonable doubt. (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) The trial court "is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.' [Citation.] [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. '"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."' [Citation.]" (*People v. Davis* (1995) 10 Cal.4th 463, 523-524.)[8]

Defendants contend that the trial court abused its discretion in denying their new trial motion by applying the standard applicable to a motion for judgment of acquittal under section 1118.1 rather than the standard for a new trial motion under section 1118, subdivision (6). Relying on *People v. Stevens* (2007) 41 Cal.4th 182, 200, they note that the standard a trial court applies in ruling on a motion for acquittal "'is the same as the

---

[8] "When an appellate court reviews the jury's verdict, it resolves all conflicts in the evidence in favor of the verdict. [Citation.] The function of the trial judge, however, is entirely different: the judge does not review the jury's determination, but instead weighs the evidence and exercises an independent judgment. [Citations.]" (6 Witkin, Cal. Criminal Law (4th ed. 2012) Criminal Judgment, § 113, p. 155.) "However, in ruling on a new trial motion, the trial judge does not ignore the verdict and decide the case as if there had been no jury. [Citation.] Accordingly, in exercising independent judgment, the judge is guided by the presumption in favor of the correctness of the verdict and the proceedings that support it. [Citation.] In the context of a new trial motion made on the ground that the verdict is contrary to evidence, this presumption means only that the trial judge may not arbitrarily reject a verdict that is supported by substantial evidence." (*Id.* at p. 156.)

standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."' [Citation.]" They assert that the trial court's remarks show that it incorrectly believed that it was bound by the jury's credibility determination. (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251 [in ruling on a new trial motion, a "trial court is not bound by the jury's determinations as to the credibility of witnesses . . ."].)

In his recitation of the trial court's ruling, Wilson only sets forth the second paragraph of the trial court's remarks. That second paragraph may, by itself, suggest that the trial court incorrectly applied the judgment of acquittal standard in ruling on defendants' new trial motion by reviewing the evidence to determine if there was any substantial evidence that supported the guilty verdicts and firearm use and infliction of great bodily injury findings and by accepting the jury's credibility findings. The first paragraph, however, of the trial court's ruling, which we quote above, demonstrates that the trial court correctly applied the new trial motion standard and made its own credibility determinations. In that first paragraph, the trial court said that it had heard the evidence. It noted the inconsistencies in Rodriguez's testimony, but found that other evidence corroborated Rodriguez's testimony. That is, the trial court's full remarks demonstrate that it weighed the evidence independently and determined, in its opinion, that there was sufficient credible evidence to support the verdicts and findings. (*People v. Davis, supra,* 10 Cal.4th at p. 523.) King contends that the trial court's statement in the first paragraph of its ruling that other evidence tended to corroborate Rodriguez's testimony "merely emphasized that the same evidence could be viewed in different ways, not that the court personally had concluded that guilt had been proven beyond a reasonable doubt." To the contrary, the trial court's remark was an express finding, based on the evidence, that Rodriguez had testified truthfully. Accordingly, the trial court did not abuse its discretion by employing the wrong legal standard in ruling on defendants' new trial motion.

15

**III. Wilson's Section 667.5, Subdivision (b) Enhancement**

Wilson contends that the trial court erred in staying rather than striking the one-year section 667.5, subdivision (b) sentence enhancement, and requests that we order the trial court to strike the enhancement. The Attorney General agrees that the trial court erred in staying the section 667.5, subdivision (b), enhancement but argues that we should remand the matter so that the trial court can exercise it discretion in deciding whether to impose or strike the enhancement. We agree with the Attorney General.

Once a section 667.5, subdivision (b) allegation has been found true, a trial court must impose or strike, and may not stay, the enhancement. (*People v. Langston* (2004) 33 Cal.4th 1237, 1241.) Accordingly, the trial court erred in staying imposition of the section 667.5, subdivision (b) enhancement. We remand the matter to the trial court to determine whether to impose or to strike the 667.5, subdivision (b) enhancement. (*People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1041.)

**IV. Detective Parker's Testimony About King's Cellphone**

King argues that the prosecutor committed misconduct by shifting the burden of proof through questions that implied that King had to produce expert testimony to corroborate her claim about the manner in which her cellphone operated. There was no misconduct. Moreover, even if the prosecutor's questions were misconduct, there was no prejudice because the trial court admonished the jury to disregard the questions at defense counsel's request and in language defense counsel approved.

*A. Background*

In her examination of Detective Parker, the prosecutor asked the detective, "In this case, um, did you provide Miss King's cell phone to [defense counsel] so she could have an expert look at it?" Defense counsel objected, and the trial court sustained the objection. The prosecutor then asked, "The cell phones of the two defendants were booked into evidence; correct?" Detective Parker responded, "Yes." The prosecutor began a question, "And to the extent that the defense wants to review them—" Defense

16

counsel again objected.  The trial court asked the prosecutor and defense counsel to approach for a sidebar conference.

At the sidebar conference, the defense counsel stated that the prosecutor's questions improperly shifted the burden to the defense to appoint an expert to examine King's cellphone.  The prosecutor denied that she had shifted the burden and asserted that she was permitted to elicit testimony that the detective had provided the cellphone to defense counsel so that she could have an expert examine it.  She argued that her questions concerned a subject like the "failure to call logical witnesses."  The trial court stated, "I do think it's somewhat inappropriate to indicate that they should have had it analyzed because they had access to it.  And I think it's—I think it might be crossing the line, and I don't think—I'm sure you did not intend to do that."

Defense counsel stated, "[A]t this point, your Honor, I think we need to maybe admonish the jury to tell them that question was improper and they need to disregard it . . . ."  The trial court proposed that the matter be addressed through "a statement, almost like a stipulation" that it would read to the jury.  Defense counsel proposed, "[T]he question that was just asked was improper and burden shifting, and the jury should disregard the question and not speculate as to what the answer would have been."

A discussion was held off the record.  When the trial resumed on the record, the trial court stated that a stipulation had been fashioned that it believed all parties agreed would be read to the jury.  The parties agreed that there was a stipulation.  The trial court then admonished the jury, "Ladies and gentlemen, we had a conversation and basically the jury is advised to disregard and not speculate the question that suggests that providing [defense counsel] with the—with Miss King's cell phone and having her look at it.  [¶] You're not to speculate to anything about this as to whether this event even occurred.  So just disregard it in its entirety."  Prior to admonishing the jury, the trial court ruled, "This is not a case of prosecutorial misconduct."

17

## B.     Application of Relevant Principles

""""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" [Citations.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1072.)  "Although a prosecutor may comment [in closing argument] that a defendant has not produced any evidence, he or she may not suggest that 'a defendant has a duty or burden to produce evidence . . . .' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1195-1196.)

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854; *People v. Williams* (2006) 40 Cal.4th 287, 323 ["'A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged . . .'"].)  A prosecutor's misconduct may serve as the basis for a mistrial. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1154.)

The prosecutor did not engage in prejudicial misconduct.  There is no reasonable likelihood that the jurors would have understood the prosecutor's questions as implying that defendant had the burden of producing evidence.  (See *People v. Young, supra,* 34 Cal.4th at p. 1196.)  Instead, the questions properly asked whether defense counsel had been provided access to the cellphone to have an expert examine it.  (See *People v. Cook* 2006) 39 Cal.4th 566, 607 [a prosecutor's question asking whether the defense had the opportunity to independently test evidence does not suggest that the defense had a duty to do independent testing or shift the burden of proof].)

Moreover, even if the prosecutor's questions were misconduct, there was no prejudice.  Defense counsel objected to the first prosecution question she alleged was misconduct and the trial court sustained the objection.  When defense counsel objected to

18

a second question she claimed was misconduct, the trial court called the prosecutor and defense counsel to the sidebar. Defense counsel requested that the trial court admonish the jury concerning the prosecutor's challenged questions. The trial court admonished the jury with language stipulated to by defense counsel. Defense counsel did not request a mistrial based on the alleged misconduct, apparently believing that the misconduct could be cured by a suitable jury admonition. Defense counsel was in the best position to judge whether, under the circumstances of the trial and her evaluation of the jury, a jury admonition could adequately address the matter.

**V.      King's Claim That Defense Counsel Provided Ineffective Assistance of Counsel by Failing to Request an Instruction on Third-Party Culpability**

King claims that defense counsel provided ineffective assistance of counsel when she relied on a third-party culpability theory at trial, but failed to request an instruction on third-party culpability. King has failed to demonstrate that she received ineffective assistance of counsel.

"'Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.]'" (*People v. Foster* (2003) 111 Cal.App.4th 379, 383.) If the defendant fails to make a sufficient showing either of deficient performance or prejudice, the ineffective assistance claim fails. (*Ibid.*)

In considering a claim of ineffective assistance of counsel, it is not necessary to determine "'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

19

we expect will often be so, that course should be followed.'" (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 697.)

The record on appeal does not reveal why defense counsel did not request a pinpoint instruction on third-party culpability. However, even if the evidence supported an instruction on third-party culpability and defense counsel had no reason for failing to request such an instruction, King was not prejudiced. Our Supreme Court has held that the omission of instructions that "properly pinpoint the theory of third party liability . . . is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. (*People v. Ledesma* (2006) 39 Cal.4th 641, 720-721 [47 Cal.Rptr.3d 326, 140 P.3d 657]; *People v. Earp* (1999) 20 Cal.4th 826, 887 [85 Cal.Rptr.2d 857, 978 P.2d 15].)" (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.) Here, the jury was properly instructed on reasonable doubt with CALCRIM No. 220. Accordingly, even assuming defense counsel's performance was deficient for failing to request a pinpoint instruction on third-party culpability, King was not prejudiced by defense counsel's failure, and King thus cannot establish ineffective assistance of counsel.

## VI.    The Prosecutor's Puzzle Analogy in Rebuttal Closing Argument

King argues that the prosecutor committed misconduct in rebuttal closing argument when she compared the jury's task with "putting together a puzzle." The analogy, she argues, trivialized the beyond a reasonable doubt standard of proof. If she forfeited appellate review of this issue by defense counsel's failure to object to the prosecutor's argument in the trial court, she contends, then she received ineffective assistance of counsel. As noted above, Wilson joins King's prosecutorial misconduct argument. Defendants forfeited appellate review of this argument by defense counsels' failure to object to the prosecutor's remarks in the trial court. Defendants' alternative claim of ineffective assistance of counsel fails because any deficient performance by defense counsel was not prejudicial.

20

*A.    Background*

In her rebuttal closing argument, the prosecutor said, "Your job, ladies and gentlemen, is kinda like putting together a puzzle.  You're going to take the pieces of the puzzle.  You put them together to see an image on the box.  You know it is a kitten, a hot air balloon, or whatever.  [¶]  Because this is real life and it's not T.V., it's not make believe, this isn't like a brand new puzzle from yesterday, which is all new and perfect.  [¶]  This is more like a puzzle you got at a garage sale and maybe there's a piece or two missing or maybe one of the pieces gnarled by a dog and in marinara sauce from the recent game night.  [¶]  The question still remains, when you put together the pieces you do have, can you see the images on the box?  Can you see these defendants conspired to rob the victim?"  Neither defendant objected to the prosecutor's argument.

*B.    Application of Relevant Principles*

In *People v. Katzenberger* (2009) 178 Cal.App.4th 1260 (*Katzenberger*), the prosecutor used a PowerPoint slide show presentation in her closing argument to illustrate the reasonable doubt standard.  (*Id.* at p. 1264.)  In the slide show, six puzzle pieces came onto the screen sequentially.  (*Ibid.*)  The picture was "immediately and easily recognizable as the Statue of Liberty."  (*Ibid.*)  The slide show ended when the sixth puzzle piece was in place, leaving two rectangular puzzle pieces missing.  (*Ibid.*)  The prosecutor argued to the jury "'[we] know [what] this picture is beyond a reasonable doubt without looking at all the pieces of that picture.  We know that that's a picture of the Statue of Liberty, we don't need all the pieces of the [*sic*] it.'"  (*Id.* at p. 1265.)  Defense counsel objected.  (*Ibid.*)

On appeal, the court of appeal held, "'Although counsel have "broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law.  [Citation.]"'  [Citation.]  In particular, it is misconduct for counsel to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.  [Citation.]  We agree with defendant that the prosecutor's use of the

21

PowerPoint presentation here misrepresented the 'beyond a reasonable doubt' standard." (*Katzenberger, supra,* 178 Cal.App.4th at p. 1266.)

The court of appeal believed that most jurors would recognize the image of the Statue of Liberty well before the first six puzzle pieces were in place. (*Katzenberger, supra,* 178 Cal.App.4th at p. 1267.) It stated, "The presentation, with the prosecutor's accompanying argument, leaves the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence. It invites the jury to guess or jump to a conclusion, a process completely at odds with the jury's serious task of assessing whether the prosecution has submitted proof beyond a reasonable doubt." (*Ibid.*)

The court of appeal also held that the prosecutor's argument was improper because it contained a quantitative component. (*Katzenberger, supra,* 178 Cal.App.4th at p. 1267.) That is, when the prosecutor told the jury, "'this picture is beyond a reasonable doubt,'" when only six of the eight puzzle pieces were in place, she inappropriately suggested a "specific quantitative measure of reasonable doubt, i.e., 75 percent." (*Id.* at pp. 1267-1268.) It held that the prosecutor's misconduct was harmless beyond a reasonable doubt, however, because the trial court reinstructed the jury on reasonable doubt after defense counsel vigorously contended in his closing argument that the Statue of Liberty presentation did not represent reasonable doubt at all, and the evidence of the defendant's guilt was strong. (*Katzenberger, supra,* 178 Cal.App.4th at pp. 1268-1269, citing *Chapman v. California, supra,* 386 U.S. at p. 24.)

In *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*), decided after the trial in this case, the prosecutor described to the jury the concept of reasonable doubt using a visual display of the outline of California and hypothetical testimony from several witnesses describing various cities in California. (*Id.* at p. 665 & fn. 4.) The Supreme Court agreed with the holding in *Katzenberger, supra,* 178 Cal.App.4th 1260. It held, "The use of an iconic image like the shape of California or the Statue of Liberty, unrelated to the facts of the case, is a flawed way to demonstrate the process of proving guilt beyond a reasonable doubt. These types of images necessarily draw on the jurors' own knowledge rather than evidence presented at trial. They are immediately

22

recognizable and irrefutable. Additionally, such demonstrations trivialize the deliberative process, essentially turning it into a game that encourages the jurors to guess or jump to a conclusion." (*Centeno, supra,* 60 Cal.4th at p. 669.)

### 1. Forfeiture

Neither Wilson nor King objected to the prosecutor's use of the puzzle analogy in rebuttal closing argument. The failure to object forfeited appellate review of this issue. (*Centeno, supra,* 60 Cal.4th at p. 674.) King attempts to avoid her forfeiture by arguing that making an objection "may have appeared futile" to defense counsel. However, as she acknowledges, "[p]ersuasive authority on this issue did exist at the time of trial in the form of *People v. Katzenberger* (2009) 178 Cal.App.4th 1260."

### 2. Ineffective assistance of counsel

King argues that if defense counsel's failure to object forfeited review of this issue, then defense counsel provided ineffective assistance of counsel. However, even if the prosecutor's puzzle analogy in this case was improper for the reasons stated in *Centeno, supra,* 60 Cal.4th 659 and *Katzenberger, supra,* 178 Cal.App.4th 1260, defendants cannot demonstrate ineffective assistance of counsel because there was no prejudice. (*In re Fields, supra,* 51 Cal.3d at p. 1079 [ineffective assistance of counsel claims properly are resolved on the ground of lack of sufficient prejudice without determining whether counsel's performance was deficient].)

In *Centeno, supra,* 60 Cal.4th 659, the Supreme Court found no tactical reasons for the defense counsel's failure to object. The court held, "'Explaining' the reasonable doubt standard by using an iconic image unrelated to the evidence is particularly misleading to the jury and strikes at the most fundamental issue in a criminal case. The image is too powerful and pivotal to dismiss as irrelevant or trivial argument. Additionally, the argument was aimed at lessening, not heightening, the burden of proof. The prosecutor posited an easy example of proof beyond a reasonable doubt to reassure this jury that it could confidently return guilty verdicts in a case not nearly so strong as

her hypothetical. . . . [¶] Additionally, because the prosecutor's hypothetical came in rebuttal, defense counsel had no opportunity to counter it with argument of his own. His only hope of correcting the misimpression was through a timely objection and admonition from the court. Under these circumstances, we can conceive of no reasonable tactical purpose for defense counsel's omission." (*Id.* at pp. 675-676.)

The court then turned to prejudice. (*Centeno, supra,* 60 Cal.4th at pp. 676-677.) It observed that "courts [have] found the prosecutors' use of visual aids harmless in light of the correct instructions on reasonable doubt, defense counsel's objections to the argument, the trial courts' admonition, and the strength of the evidence. [Citations.]" (*Id.* at p. 676.) In *Centeno*, the Supreme Court found prejudice, primarily because, as the People conceded, it was "a very close case." (*Id.* at p. 677.)

Here, the trial court properly instructed the jury on reasonable doubt with CALCRIM No. 220, and, contrary to defendants' contention, there was strong evidence of guilt notwithstanding Rodriguez's difficulty communicating and varying accounts of the incident. The case against defendants included direct and circumstantial evidence that they robbed and conspired to rob Rodriguez and that Wilson assaulted Rodriguez with a firearm. The evidence included Rodriguez's testimony identifying Wilson and King as his assailants, King's testimony admitting that she had been in the motel room with Rodriguez and that Wilson entered the room and struck Rodriguez on the chin, the medical testimony concerning Rodriguez's injuries, the video surveillance tape which showed the timing of the offenses, and the texts between Wilson and King. Accordingly, any deficient performance was not prejudicial. (*Centeno, supra,* 60 Cal.4th at p. 676; *Katzenberger, supra,* 178 Cal.App.4th at p. 1269.)

24

## DISPOSITION

The trial court's order staying imposition of Wilson's section 667.5, subdivision (b) enhancement is reversed and the matter is remanded to the trial court to exercise its discretion to impose or strike the enhancement. The judgments are otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS




MOSK, J.


I concur:



TURNER, P. J.

BAKER, J., Concurring


       I join the majority's opinion except its holding that the trial court did not err in granting the prosecution's motion in limine to preclude any cross-examination of the victim concerning his statement to the prosecutor "about wanting a U-visa."  I concur in the disposition because I am convinced the decision to grant the in limine motion and preclude cross-examination was not prejudicial under either the *People v. Watson* (1956) 46 Cal.2d 818 test or the *Chapman v. California* (1967) 386 U.S. 18 test.


                                          BAKER, J.